IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| ASARCO LLC, a Delaware Corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>ATLANTIC RICHFIELD COMPANY, a Delaware Corporation,<br><br>    Defendant. | CV 12–53–H–DLC<br><br>FINDINGS OF FACT, CONCLUSIONS OF LAW, and JUDGMENT |

## INTRODUCTION

As summarized in the November 19, 2020 Order (Doc. 324) and otherwise discussed extensively throughout the nine-year life of this case, Plaintiff ASARCO LLC ("ASARCO") and Defendant Atlantic Richfield Company's ("Atlantic Richfield")[1] smelting and fuming activities in East Helena, Montana (the "Site") caused arsenic contamination to the groundwater. [2]   (Doc. 269 at 28, 53.)  In 2009, ASARCO entered into complimentary settlement agreements and consent decrees with the United States and State of Montana to resolve its outstanding

---

[1] Atlantic Richfield is the successor in interest to Anaconda Mining Company ("Anaconda"), which leased a portion of the East Helena Site from ASARCO and operated a zinc fuming plant there from 1927 to 1972.  *See, e.g., ASARCO LLC v. Atlantic Richfield Company, LLC*, 975 F.3d 859, 862–63 (9th Cir. 2020) ("*ASARCO II*").
[2] The Site is designated as a National Priorities List or "Superfund" site.  42 U.S.C. § 9605.

environmental liabilities at various Montana sites, including the Site at East

Helena. *ASARCO II*, 975 F.3d at 863.

Relevant here, the consent decree between ASARCO and the United States

(the "Decree") established a custodial trust to fund the cleanup of several

contaminated sites, with the Montana Environmental Trust Group ("METG") as

the custodial trustee and the Environmental Protection Agency ("EPA") as the lead

agent for the East Helena Site. *Id.* Pursuant to the Decree, ASARCO paid $111.4

million[3] into the trust for Site cleanup, "accounting for comprehensive damage

done to the Site by all responsible parties." *Id.* (*See also* Doc. 269 at 78); *and see*

*ASARCO LLC v. Atlantic Richfield Co.*, 866 F.3d 1108, 1115 (9th Cir. 2017)

("*ASARCO I*").

In 2012, ASARCO brought a contribution action under CERCLA[4] §§ 107

and 113(f)(3)(B) against Atlantic Richfield. (*See generally* Doc. 28.) Specifically,

ASARCO sought to hold Atlantic Richfield liable for its equitable share of the

costs that had been incurred for response action at the Site. (Doc. 28 at 2.) After

---

[3] Of this amount, $99.294 million was paid for a groundwater remedy to clean up the off-Site groundwater; $8.9 million covered costs to "establish the Custodial Trust and to fund the Custodial Administrative Account for the purposes of administration of the Custodial Trust, of which the proportionate share for the East Helena Site would be $6,403,743"; $706,000 funded the United States Department of the Interior natural resource restoration and future oversight costs for the Site; and $5 million was allocated to the State of Montana for the Site in compensatory natural resource damages. (Doc. 269 at 16–17.)

[4] Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–9675.

an eight-day bench trial in 2018, the Court first determined that ASARCO "incurred $111,403,743 in response costs" within the meaning of CERCLA § 107—the full amount paid by ASARCO in connection with the Decree. (Doc. 269 at 82.) Second, the Court found Atlantic Richfield responsible for twenty-five percent of those incurred response costs, *i.e.*, $27,850,936. (*Id.* at 88.)

On appeal, the Ninth Circuit concluded that the expert testimony ASARCO proffered—and which the Court found most persuasive—was "steeped in speculation" and thus insufficient to support finding the full $111.4 million settlement amount eligible for contribution. *ASARCO II*, 975 F.3d at 867–68. That is, ASARCO's evidence failed to show that the full settlement amount represents necessary response costs "incurred" at the Site. *See id.* at 866 (emphasis added). The appellate court found no error, however, in this Court's "devising an equitable allocation of liability for Site cleanup" by pegging Atlantic Richfield's responsibility at twenty-five percent of the response costs actually incurred at the Site. *Id.* at 868.

Accordingly, this case returned from the Ninth Circuit with the mandate that the Court "further consider[] [] what necessary response costs were actually incurred within the meaning of CERCLA." *Id.* Atlantic Richfield immediately moved the Court to enter a final judgment allocating $48.5 million as the amount

incurred, based on ASARCO's "pleadings, the evidence it presented at trial, and the Court of Appeals' ruling[.]" (Doc. 314 at 2.) Applying the rule of mandate, the Court denied the motion. (Docs. 314 at 2; 324 at 10–13.) At the same time, the Court granted ASARCO's motion for leave to supplement and amend the First Amended Complaint. (Docs. 316 at 7; 324 at 13–23.) Consequently, ASARCO's prayer for relief would now include (1) contribution on all costs "incurred" since the 2018 bench trial; and (2) declaratory relief pursuant to 42 U.S.C. § 9613(g)(2) to recover contribution for future costs when they are actually "incurred.'" (Docs. 324 at 23; 325 at 10–11.) [5]

The Court set the matter for an evidentiary hearing on February 4 and 5, 2021 to consider what costs have actually been "incurred" at the Site and are eligible for contribution. (Doc. 324 at 24–25.) Gregory Evans, Kris McLean, and Rachel H. Parkin represented ASARCO. Randy Cox, Benjamin Strawn, and Kenzo Kawanabe represented Atlantic Richfield. The Court admitted about 43 exhibits and heard testimony from three witnesses: Margaret Staub for ASARCO, and Donald G. Booth and Jennifer E. Roberts for Atlantic Richfield.

Based on the evidence and testimony presented at the post-remand hearing,

---

[5] At the post-remand evidentiary hearing, Atlantic Richfield renewed its objection to ASARCO's motion to amend and supplement its Amended Complaint, which the Court overruled for the same reasons given in its November 19, 2020 Order. (*See* Doc. 324 at 23; Hr'g Tr. vol. 1, 10:8–22 (Feb. 4, 2021).)

and further considering the applicable law and the arguments made at the hearing and in the parties' written submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

**FINDINGS OF FACT**

## I.    Relevant Background[6]

1.      While METG serves as trustee of and acts as a fiduciary for the custodial trust established pursuant to the Decree, the EPA is the lead agent for cleanup activities at the Site.  As lead agent, the EPA is charged with selecting, approving, and authorizing all work performed and funds expended by METG from the custodial trust cleanup account for the Site.[7]

2.      Since 2009, METG has used money ASARCO paid into the trust to fund a series of environmental actions intended to address and remediate contaminated groundwater at the Site.  METG's Site activity is the focus of any potential allocation responsibility because it is the work being funded by ASARCO.  ASARCO seeks no contribution for any work it performed at the Site.[8]

---

[6] The Court incorporates by reference, as though fully set forth herein, the facts it previously found following the 2018 bench trial that formed neither the basis of Atlantic Richfield's appeal nor the Ninth Circuit's opinion and mandate.  (*See* Docs. 269 at 2–25; 353 at 10 (Atlantic Richfield's suggestion that "[w]here necessary to establish the foundation for additional findings reached after the Post-Remand hearing, the Court [may] include[] here many of its previous findings based on the evidence at the May/June 2018 trial").)

[7] Ex. 570 at 8.

[8] Doc. 269 at 21–22.

## II.     Stipulated Expenditures

3.     Prior to the evidentiary hearing, ASARCO and Atlantic Richfield

stipulated that pursuant to EPA selection, approval, and authorization, METG has

expended the following amounts from the trust account to remediate the Site:

- 2010: $2,899,126;
- 2011: $3,391,552;
- 2012: $5,931,873;
- 2013: $12,417,138;
- 2014: $7,900,643;
- 2015: $11,509,178;
- 2016: $12,678,441;
- 2017: $1,464,955;
- 2018: $843,715;
- 2019: $1,378,766;
- 2020 (through third quarter): $934,971.[9]

4.     The Decree allowed that ASARCO could obtain a credit for work it

performed between February 2009 and the date of the trust account's funding.

Indeed, ASARCO received such a credit in the amount of $2,959,775.[10]  While

ASARCO initially urged that this amount, too, constituted a cost eligible for

contribution, it abandoned this argument at the post-remand evidentiary hearing.[11]

---

[9] Doc. 327.  The Court recognizes that the sum of these expenditures totals $61,350,358—one dollar less than the total amount to which the parties stipulated at the hearing and in their respective proposed findings of fact.  (*See* Docs. 353 at 35; 353 at 21.)  However, because the parties agree, the Court does not disturb the total stipulated amount based on an apparent clerical error.

[10] Ex. 403.

[11] Hr'g Tr. vol 2, 348:25–349:11 (Feb. 5, 2021).

5.      ASARCO also paid $8,888,114 (after an $11,885.27 credit against the funds the Decree obligated it to pay) to "establish a Custodial Trust and to fund the Custodial Administrative Account for the purposes of administration of the Custodial Trust."  This administrative expenditure covered various Montana sites.[12]  While it initially argued for contribution against this outlay, ASARCO also abandoned this argument at the post-remand evidentiary hearing.[13]

6.      ASARCO also paid $5,706,000 for natural resource damages.[14] ASARCO presented no evidence or argument related to recovering contribution for these damages.

7.      Thus, the parties agree that METG has thus far spent $61,350,359 through the custodial trust account for remediation work performed at the Site.[15]

## III.    Selection of the Final Remedy

8.      In addition to remediation costs undisputedly expended by METG before and since the 2018 trial, *supra*, the parties also agree that the administrative process has progressed.  Specifically, at the time of trial, METG—at the direction of the EPA— had recently issued its *Former ASARCO East Helena Facility Corrective Measures Study Report* ("*2018 CMS Report*").  However, the *2018*

---

[12] Ex. 403 at 1.
[13] Hr'g Tr. vol. 2, 348:14–24.
[14] Doc. 269 at 17.
[15] Hr'g Tr. vol. 2, 349:19–23, 366:10–13.

*CMS Report* only existed then in draft form and the EPA had not yet approved it or selected any remedies from it.[16]

9.      In general, the purpose of a corrective measures study report is to investigate and evaluate alternative remedies to protect human health and the environment from hazardous releases at a Superfund site and to restore contaminated media to EPA-approved standards.[17]

10.     Such is the case here.  In the *2018 CMS Report*, METG described "the process by which remedial action alternatives were developed and evaluated in order to identify a recommended alternative for addressing soil, groundwater, surface water, and sediment" contamination at the Site.[18]

11.     Evaluating alternative methods in the *2018 CMS Report*, METG specifically analyzed: (1) long-term effectiveness and permanence; (2) toxicity, mobility and volume reduction; (3) short-term effectiveness; (4) implementability; (5) cost; (6) community acceptance; and (7) State acceptance.[19]

12.     In July 2020—more than two years after trial—the EPA conditionally approved the *2018 CMS Report*. [20]   In its *Statement of Basis for Groundwater,*

---

[16] Hr'g Tr. vol. 1, 36:11–15.
[17] Ex. 976 at 13; Hr'g Tr. vol 1, 36:11–15, 37:14.
[18] Ex. 976 at 13.
[19] *Id.* at 11.
[20] METG satisfied the conditions required for final approval in an October 8, 2020 addendum letter.  Ex. 1001 at 1.

*Surface Water and Soil Corrective Measures (Remedy) Decision at Former ASARCO East Helena Facility* ("*Statement of Basis*"), the EPA selected from the remedies described and evaluated in the *2018 CMS Report* and identified those remedies that will serve as the final remedies (collectively, "Final Remedy") for the Site.[21]

13.     The *Statement of Basis* outlines the EPA's reasoning for this selection, explaining that the Final Remedy consists of "multiple elements that work together to protect human health and the environment."[22]

14.     The *Statement of Basis* further establishes that, based upon "the review of the [*2018 CMS Report*], knowledge of the remedial activities that have been implemented, and understanding of the contamination present at the [Site], [the EPA] has concluded  that the remedies recommended by [METG] will meet the cleanup objectives for the Site."[23]

15.     As part of the Final Remedy, the EPA selected a combination of interim measures ("IMs") which have already been implemented, including an Evapotranspiration Cover, South Plant Hydraulic Controls, Source Removal and Corrective Management Units, Speiss-Dross Slurry Wall, and Institutional

---

[21] Ex. 570 at 7, 9.
[22] *Id.* at 9.
[23] *Id.* at 9.

Controls, and also selected an additional remedy for the slag pile. The *Statement of Basis* further provides for ongoing Performance Monitoring and Operations & Maintenance.[24]

16.    The *Statement of Basis* is in its final form. The EPA presented to the public the Final Remedy it selected via the *Statement of Basis* during a meeting on December 8, 2020.[25]

17.    In October 2020, METG released the *Former ASARCO East Helena Facility Corrective Measures Implementation Work Plan* ("*Work Plan*") in response to the EPA's *Statement of Basis*. The *Work Plan* was "developed to implement the decisions set forth and supported in the [*Statement of Basis*]" and is intended to "detail all work and related requirements and schedules for the timely implementation and completion of such corrective action measures."[26]

18.    The *Work Plan* "outlines [METG's] plan to design, construct, operate monitor, and maintain the final corrective measures" for the Site.[27]

19.    Together, METG's *2018 CMS Report*, the EPA's *Statement of Basis*, and METG's *Work Plan* outline the Final Remedy to be implemented for the Site, identifies costs associated with the implementation of the Final Remedy, and

---

[24] *Id.* at 9–10.
[25] Hr'g Tr., vol. 1, 48:21–49–1; Ex. 570 at 1; Ex. 576 at 1.
[26] Hr'g Tr., vol. 1, 39:2–6; Ex. 571 at 8.
[27] Ex. 571 at 8.

establishes that the Final Remedy will be protective of human health and the environment.[28]

20.     At the post-remand hearing, Ms. Staub explained that the Final Remedy is comprised of "four key elements that are still going to be ongoing." [29] The Court makes its findings on each element, in turn, below.

### A.     Slag Pile

21.     The slag pile covers approximately 45 acres, is 120 feet tall at its highest point, and contains approximately 3,560,000 cubic yards of slag.[30]  It continues to be a major source of remaining arsenic contamination to groundwater.[31]

22.     METG noted in the *2018 CMS Report* that the pile "consists of two types of slag, fumed and unfumed slag, that are generally segregated in the pile due to the distinct production and disposal time periods. . . . [T]he unfumed slag contains higher metals concentrations than the fumed slag."  As such, METG concluded, the unfumed slag "has the higher potential to leach [metals] to groundwater," and is therefore "considered the likely source of contaminants

---

[28] Hr'g Tr. vol. 1, 38:7–11, 87:19–23; Ex. 570 at 9–10, 85.
[29] Hr'g. Tr. vol. 1, 48:2–17.
[30] Ex. 976 at 51.
[31] Ex. 573 at 1.

entering the groundwater beneath the slag pile."[32]

23.     Although Mr. Booth opined that a remedy for the slag pile is driven primarily by selenium loading, with the upper lift of unfumed slag on the pile representing about 75% of remaining selenium in the groundwater,[33] Ms. Staub countered that the slag pile is an ongoing source of *both* selenium and arsenic to the groundwater.[34]

24.     Indeed, the EPA identified arsenic as a driver of the slag pile remedy, stating in a Fact Sheet released to the public in October 2020 that: "After the [F]inal [R]emedy is completed—re-grading and capping the ASARCO slag pile to minimize *the last major source of arsenic contamination to the groundwater*— METG will continue to monitor groundwater conditions to make sure that cleanup goals are being achieved."[35]

25.     The EPA also noted in this Fact Sheet that "METG recently submitted [the *Work Plan*] to EPA outlining its proposal to regrade and cap the ASARCO slag pile to prevent *arsenic* (and selenium) from leaching into the groundwater in East Helena."[36]

---

[32] Ex. 976 at 51.
[33] Ex. 576 at 28; H'rg Tr. vol. 2 at 297:20–599:3.
[34] Hr'g Tr. vol. 1 at 199:16–19.
[35] Ex. 573 at 1.
[36] Ex. 573 at 2; Ex. 571 at 1.

26.     METG generated and the EPA considered three different slag pile cover alternatives in the *2018 CMS Report*—minimum, medium, and maximum. For each alternative, METG calculated associated costs, including site demolition, waste disposal, slag grading, cover soils, Evapotranspiration cover, hydroseeding, and site preparation costs like mobilization, permitting, stormwater controls, and closing out the project.[37]   Using its prior experience and knowledge of past remediation expenditures at the Site, METG calculated the minimum alternative for the slag pile cover at $4,536,000, the intermediate alternative at $8,063,000, and the maximum alternative at $9,863,000.[38]

27.     Ultimately, however, EPA did not select any of the three alternatives identified in the *2018 CMS Report*, and instead—along with METG—successfully negotiated a deal with a third-party metals broker to remove about 2 million tons of unfumed slag from the surface layer of the pile.

28.     Then, once the broker hauls that material offsite, the Final Remedy calls for regrading the remaining slag pile—comprised of fumed slag and older unfumed slag—and capping it with a soil and vegetative cover.[39]   Because the slag remaining onsite after the upper lift of unfumed slag is removed will still be

---

[37] Ex. 583 at 53–55; Hr'g Tr. vol. 1, 54:19–23.
[38] Hr'g Tr. vol. 1, 58:6–9; Ex. 583 at 53–55.
[39] Ex. 570 at 22, 38; Ex. 576 at 26; Ex. 1027 at 59; Hr'g Tr. vol. 1, 49:9–14; Hr'g Tr. vol. 2, 292:6–14.

regraded and fully covered by a vegetative cover, the evidence that the fumed slag remains a source of arsenic and other contaminants that will continue to require corrective measures is underscored.[40]

29.    The *Work Plan* accounts for EPA's chosen final remedy as it relates to the slag pile, calculating a total cost of $7,660,000, which includes both design and construction expenses.[41]  Ms. Staub testified that, "by selecting the final remedy [for the slag pile], [the EPA] committed to costs to implement the remedy."[42]

30.    Mr. Booth agreed that while nothing is speculative about "the need for or whether [the Final Remedy] will happen," he disagreed with the purported "certainty" surrounding METG's cost estimates.[43]

31.    Ms. Staub relied on the *Work Plan* to form the basis of her opinion that EPA has committed certain costs for the elements of the Final Remedy.[44] However, the *Work Plan* explicitly states that the calculations constitute only a "[p]reliminary [e]stimate of [c]ost."  The *Work Plan* goes on to note that its cost tables "present those costs *estimated* for the implementation of the final components of remedy[.]"[45]

---

[40] Ex. 576 at 26–28; H'rg Tr. vol. 1 at 51:5–7.
[41] Ex. 1039 at 39.
[42] Hr'g Tr. vol. 1, 38:7–11.
[43] Hr'g Tr. vol. 2, 331:17–332:8.
[44] Hr'g Tr. vol. 1, 135:2–5.
[45] Ex. 571 at 39 (emphasis added).

32.     Further, her testimony regarding the EPA's commitment to the slag pile's final remedy notwithstanding, Ms. Staub admitted that at the beginning of 2020, the EPA planned to implement the maximum alternative slag pile cover, *supra* at ¶ 26 (calculated at $9,863,000).  However, because zinc prices changed in the middle of 2020, a fourth remedy—the removal of two million tons of slag before regrading and capping the remainder—became feasible and was ultimately selected by the EPA.  She went on to agree that if metal prices continued to trend favorably, more slag than two million tons could be removed.[46]

33.     The *Work Plan* also indicates that "because unfumed slag removal activities would impact a significant area of the slag pile footprint, development of the final grading and cover plan would not start until the unfumed slag removal is complete."  At the time METG published the *Work Plan* in October 2020, "the removal and recovery operation [was] estimated to be approximately 10 years."[47]

34.     Ms. Staub went on to concede that, while the EPA relied on cost estimates to establish a Final Remedy, METG is charged with developing detailed designs necessary for implementation.  After that, Ms. Staub explained, "they [METG] will update their costs."  She admitted that she did not "know whether they're [the updated costs] gonna be the same or different" than those estimated in

---

[46] Hr'g Tr. vol. 1, 140:8–141:18.
[47] Ex. 1039 at 19.

the *Work Plan*.[48]

35.    And, while the "EPA has announced and selected and published the [F]inal [R]emedy, and the [F]inal [R]emedy has costs associated with it," Ms. Staub agreed that no actual invoices or other contractual obligation are tethered to the costs estimated by METG in the *Work Plan*.[49]  Moreover, she explained that in "typical engineering practice," cost estimates in similar circumstances cover a range of minus thirty to plus fifty percent of the stated cost, and she admitted that she did not know whether future costs at the Site—including the selected remedy for the slag pile—could ultimately be thirty percent lower or fifty percent higher than the costs estimated in the *Work Plan*.[50]

36.    Similarly, Ms. Roberts,[51] confirmed that METG accounts for potential variations in costs spent versus cost estimates.  She explained that METG relies on a "range of magnitude" ("ROM") that gauges the level of uncertainty associated with a given estimate, ranging from ROM 1 (least uncertain) to ROM 5 (most uncertain).  Ms. Roberts testified that at ROM 5, METG adds 100 percent to the cost estimated by an engineer "to be able to cover that number."  She also

---

[48] Hr'g Tr. vol. 1., 145:13–22.
[49] *Id.* at 133:23–134:10.
[50] *Id.* at 138:4–139:1.
[51] Ms. Roberts works for Greenfield Environmental Trust Group, Inc., which provides trustee services to METG.  H'rg Tr. vol. 1, 214:10–13.

explained that METG's budgeting process accounts for the fact that "for whatever reason[,] on these [Superfund] sites, as you know, things change rapidly and plans change."[52]

37.    In sum, while the EPA may have committed to remedial action as it relates the slag pile, neither Ms. Staub's testimony nor the *Work Plan* on which she relies establishes that the *costs* associated with implementing the remedy (totaling $7,660,000)—at this juncture—are anything but estimates of future costs.

## B.    Corrective Measures Operations and Maintenance

38.    The Final Remedy selected by the EPA calls for a Corrective Measures Operations and Maintenance Plan ("O&M") for each final corrective measure "to ensure the measures remain protective over time." Ms. Staub explained that O&M involves "a series of inspections, maintenance protocols, and basically looking at each of the final—the components of the [F]inal [R]emedy to make sure that they are functioning as designed and to ensure they remain protective of human health and the environment."[53]

39.    O&M covers "the entire remedy" at the Site, Ms. Staub explained— not just one element. Thus, O&M ensures that not only the "four key elements that are still going to be ongoing" at the Site remain protective, but also that the IMs do,

---

[52] Hr'g Tr. vol. 1, 214:10–13; 238:9–239–9; 222:7–8.
[53] Ex. 571 at 21; H'rg Tr. vol. 1, 66:2–7.

including: "the ET cover; the south plant hydraulic controls; the corrective action management units; the slag pile, [and] the slurry wall."  Margaret Staub testified further that "there's fencing around the [S]ite that needs to be maintained.  There's erosional features.  There's erosional control structures.  So it's [O&M] a . . . pretty hefty job." [54]

40.     Ms. Staub went on to explain the importance of O&M in implementing the Final Remedy: "[I]n order for . . . that remedy to remain protective of human health and the environment, the remedies need to be maintained, and you can't do that unless you're operating them appropriately and maintaining them appropriately."[55]

41.     Pointing to the *Work Plan*, Margaret Staub opined that EPA has "committed" to O&M costs pursuant to the Final Remedy at a rate of $305,000 per year through 2046.  At that rate, METG's *Work Plan* calculates a total of $7,930,000 for O&M costs at the Site through 2046.[56]

42.     Mr. Booth agreed that the four key ongoing elements identified by Ms. Staub—including O&M—constitute actions the METG will take at the Site and that they are "necessary," but he opined that the O&M budget through 2046

---

[54] Hr'g Tr. vol. 1, 48:2–17, 66:2–16.
[55] *Id.* at 66:18–23.
[56] *Id.* at 70:11–15; Ex. 571 at 39; *see also* Hr'g Tr. vol. 1, 71:13–17 (Ms. Staub explaining her understanding that the *Work Plan*'s calculations were reduced to net present worth).

would be more accurately pegged at lesser amount.[57]

43.     Mr. Booth's opinion about the *Work Plan*'s calculation aside, the

*Work Plan*'s cost table, and as already discussed regarding the slag pile, *supra*,

indicates that that the $305,000 rate is a "[p]reliminary [e]stimate of [c]ost."[58]

44.     Furthermore, the *Work Plan* represents that an O&M plan for each

final remedy "*will* be prepared" and "*will* . . . develop contingency and mitigation

procedures for unforeseen conditions, and identify performance requirements for

variances, modifications, or termination of O&M activities."[59]  On cross

examination, Ms. Staub admitted that "unforeseen conditions"—like floods—could

affect costs related to O&M.[60]

45.     Indeed, the *Work Plan* itself disclaims that the cost table—on which

Ms. Staub relied—constitutes a "preliminary estimate of cost" as it relates to, *inter*

*alia*, long term O&M.[61]

46.     Ms. Staub admitted, too, that past O&M costs approved by the EPA

and budgeted for by METG had significantly varied from the amount METG

actually spent on O&M.  For example, in 2019, the approved budget for O&M was

---

[57] Hr'g Tr. vol. 2, 316:2–23, 313:12–18.
[58] Ex. 571 at 39.
[59] *Id.* at 21 (emphasis added).
[60] Hr'g Tr. vol. 1, 150:5–16.
[61] Ex. 571 at 14.

$896,600, but METG only spent $275,744 on O&M that year.  As Ms. Staub put it, "[t]hat's a variance of negative $620,855."  Put another way, in 2019, METG spent more than $600,000 less than had been budgeted and approved for O&M.[62]

47.     In sum, while the EPA may have committed to O&M from the present day through 2046, neither Margaret Staub's testimony nor the *Work Plan* on which she relies evidences that the costs associated ongoing O&M (totaling $7,930,000)—at this juncture—are anything but estimates, albeit well-reasoned ones.

### C.     Corrective Measures Performance Monitoring

48.     Corrective Measures Performance Monitoring in the form of groundwater monitoring has been conducted at and downgradient of the Site since 1984, and the Final Remedy selected by the EPA requires continued groundwater monitoring to evaluate the performance of the corrective measures over time.[63]

49.     Corrective Measures Performance Monitoring includes, and will continue to include, collection of groundwater levels and elevations, surface water elevations, and groundwater and surface water quality sampling at selected monitoring locations.  Further, Corrective Measures Performance Monitoring includes permit review, review of private well statuses, and review of land use and

---

[62] Hr'g Tr. vol. 1., 158: 5–18; *see also* Ex. 1025 at 9.
[63] Ex. 570 at 22; 571 at 9, 12.

land use restrictions.[64]

50.     The contaminants tested at each monitoring well do not vary, and
testing is not limited to a single contaminant.  Every well tests for a menu of
contaminants of concern, including but not limited to arsenic, selenium, cadmium,
and zinc, as well as additional analytical parameters.  None of the wells test for
only a single contaminant.[65]

51.     Corrective Measures Performance Monitoring began in 2016,
following implementation of IMs, and continues annually for at least a thirty-year
period.  The scope of testing, including groundwater monitoring, residential water
supply monitoring, and water level monitoring does not change from year to
year.[66]

52.     Corrective Measures Performance Monitoring must occur to evaluate
the performance of the corrective measures "until MCSs [media cleanup standards]
are met at the points of compliance."[67]

53.     Corrective Measures Performance Monitoring is necessary to
demonstrate that the final corrective measures are meeting the relevant
performance criteria, that the conditions remain protective of human heath and the

---

[64] Ex. 571 at 16; 576 at 10–11.
[65] Hr'g Tr. vol. 1, 75:24–76:5.
[66] Ex. 576 at 16; Ex. 571 at 39; Hr'g Tr. vol. 1, 75:9–23.
[67] Ex. 570 at 22.

environment, and to determine if a need for additional corrective measures arises.[68] Indeed, Mr. Booth agreed that Corrective Measures Performance Monitoring is important and did not dispute its necessity.[69]

54.     As it does for the other components of the Final Remedy, the *Work Plan* also lists the costs for Corrective Measures Performance Monitoring.  And, as it does with the costs associated with O&M, the *Work Plan* sets out costs for Corrective Measures Performance Monitoring based on a thirty-year period, beginning in 2016 and ending in 2046.[70]

55.     Specifically, in the cost table designated as a "[p]reliminary [e]stimate of [c]ost," the *Work Plan* budgets $280,000 per year through 2046 for Corrective Measures Performance Monitoring.  Thus, the amount METG sets out in the *Work Plan* for Corrective Measures Performance Monitoring from 2021 through 2046 totals $7,280,000.[71]

56.     Mr. Booth provided his own estimation of the total cost for Corrective Measures Performance Monitoring going forward until 2046 ($3,041,411). However, while testifying that his numbers "have the accuracy level of what [he] would typically call a feasibility study level," he explained that even his estimate

---

[68] Ex. 571 at 16; 576 at 25.
[69] Hr'g Tr. vol. 1, 265:2–11.
[70] Ex. 571 at 39.
[71] *Id.*

contains "uncertainties."  That is, the "accuracy" of his numbers "are at the feasibility study level of minus 30 to plus 50."[72]

57.     Thus, no dispute exists as to the necessity and importance of Corrective Measures Performance Monitoring, nor that the EPA has chosen it as a component of the Final Remedy at the Site and that METG has an obligation to fund and perform this work.  At the same time, the total cost associated with Corrective Measures Performance Monitoring—from 2021 through 2046—is undisputedly an "[e]stimate."[73]

### D.     Prickly Pear Creek Bypass Channel

58.     As part of the South Plant Hydraulic Controls IM, METG constructed a temporary Prickly Pear Creek bypass channel in 2013 to route creek flow away from the south portion of the Site, and to allow the upper and lower lake to drain.[74] Or, as Ms. Staub explained, the bypass channel was constructed "at the beginning [of Site remediation] because they needed to move Prickly Pear Creek to dry out the area, drain those lakes, and you can't do that when there's a river in the way."[75]

59.     The Wilson Ditch Diversion dam was removed from Prickly Pear Creek in 2013, and Smelter Dam was removed in 2016 to allow for realignment

---

[72] H'rg Tr. vol. 2, 314:3–13.
[73] Ex. 571 at 39.
[74] Ex. 976 at 39.
[75] Hr'g Tr. vol. 1, 41:23–42:2.

and reconstruction of Prickly Pear Creek.[76]

60.    Throughout 2015 and 2016, approximately 1.25 miles of Prickly Pear Creek were reconstructed and realigned, which involved moving the channel further from the toe of the slag pile, removal of approximately 800,000 cubic yards of materials, and development of wetlands to provide habitat restoration or replacement.[77]

61.    The realigned Prickly Pear Creek channel is now established.  Thus, and as the permits that were obtained to perform the stream work in the first place require, METG must remove the temporary bypass.[78]

62.    The EPA determined that the removal of the bypass is necessary.  The *Work Plan* identifies removal of the temporary Prickly Pear Creek bypass as a specific element of O&M for the South Plant Hydraulic Controls IM.[79]

63.    The *Work Plan*'s Corrective Measures Implementation Schedule sets the Prickly Pear Creek bypass removal to begin in July 2024 and end in April 2025.  However, the Implementation Schedule is careful to note that these dates are "[s]ubject to change if circumstances arise beyond the control of [METG]."[80]

---

[76] Ex. 976 at 39.
[77] *Id.* at 39, 145.
[78] Ex. 571 at 21, 37; Hr'g Tr. vol. 1, 79:18–25.
[79] Ex. 571 at 21, 37; Hr'g Tr. vol. 1, 79:18–25.
[80] Ex. 571 at 37.

64.     In the table designated as "Corrective Measures Implementation Preliminary Estimate of Cost," the *Work Plan* states that the Prickly Pear Creek Bypass removal will cost $258,000 for design and $1,750,000 for construction.[81]

65.     In sum, no dispute exists regarding the necessity or certainty of the removal of the Prickly Pear Creek bypass as a component of the Final Remedy. However, again, the costs associated with the work—set to begin in more than three years—are undisputedly estimates at this juncture.[82]

## CONCLUSIONS OF LAW

### I.     CERCLA § 113(f) Contribution

1.     Congress enacted CERCLA in 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), "both to provide rapid responses to the nationwide threats posed by the 30–50,000 improperly managed hazardous waste sites in this country as well as to induce voluntary responses to those sites." *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 805 (S.D. Ohio 1983) (citation omitted); *accord Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (regarding Chief Judge Carl Rubin's opinion in *Chem-Dyne Corp.* as "[t]he seminal opinion on the subject of apportionment in CERCLA actions").

---

[81] *Id.*
[82] *Id.* at 39.

2.      To those lofty ends, CERCLA endeavors to "promote the timely cleanup of hazardous waste sites, ensure that polluters [are] held responsible for the cleanup efforts, and encourage settlement through specified contribution protection." *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013).

3.      Central to CERCLA's efficacy is its recognition that "[h]azardous waste sites—also known as Superfund sites—contain toxic substances often deposited by multiple entities." *ASARCO I*, 868 F.3d at 1115.  Thus, Congress drafted the statute to "spread responsibility among those entities." *Id.*

4.      CERCLA's private rights of action spread responsibility among responsible parties and further the statute's "goal of responding to hazardous situations quickly." *In re Dant & Russell, Inc.*, 951 F.2d 246, 248 (9th Cir. 1991). Through a "complex statutory framework," CERCLA establishes a "tripartite remedial scheme to enable . . . private parties to pursue in a court of law: (1) cost-recovery actions under section 107(a), (2) contribution actions under section 113(f)(1), and (3) subrogation actions under section 112(c)(2)." *Chubb Custom Ins. Co.*, 710 F.3d at 957.

5.      Here, ASARCO pleads solely for contribution pursuant to CERCLA

§ 113(f),[83] which is consistent with its posture in this case; that is, "where a

[responsible party (ASARCO)] pays the United States' or a States' response costs

pursuant to a settlement agreement." *ASARCO I*, 866 F.3d 1116.  In relevant part,

§ 113(f)(3)(B) provides that

> [a] person who has resolved its liability to the United States or a State
> for some or all of a response action or for some or all of the costs of
> such action in an administrative or judicially approved settlement may
> seek contribution from any person who is not party to a settlement [that
> immunizes such person from a contribution action].

*Id.* (quoting 42 U.S.C. § 9613(f)(3)(B)).

6.     Thus, paying into the trust pursuant to the Decree triggered

ASARCO's eligibility to pursue § 113(f) contribution from its fellow responsible

parties.  *See id.*  By "[g]ranting a settling party a right to contribution from non-

---

[83] At the outset of the Supplemental Complaint, ASARCO summarizes that "[t]his is a civil
action . . . for contribution *and cost recovery* against defendants for costs incurred by [ASARCO]
at the East Helena Site."  (Doc. 325 at 2 (emphasis added).)  Undoubtedly, ASARCO uses the
phrase "cost recovery" with colloquial imprecision, rather than to assert a separate cause of
action under CERCLA § 107(a).  *See ASARCO I*, 866 F.3d at 1113 (explaining that ASARCO's
action is one for contribution under CERCLA § 113(f)(3)(B)).  Indeed, the sole count ASARCO
pleads is a "Claim for Contribution Under Section 113(f) of CERCLA."  (Doc. 325 at 7.)
Further, the "procedural circumstance" in which ASARCO finds itself demonstrates that this is a
case about contribution under § 113(f), not cost recovery under § 107(a).  *See United States v.
Atl. Research Corp.*, 551 U.S. 128, 139 (2007) (explaining the distinct nature of the rights
established under §§ 107(a) and 113(f)).  That is, ASARCO seeks to recover contribution as it is
traditionally understood: "the tortfeasor's right to collect from others responsible for the same
tort after the tortfeasor has paid more than his or her proportionate share, the shares being
determined as a percentage of fault."  *Id.* at 138 (citation and internal quotation marks omitted).
ASARCO does not seek recovery for cleanup costs "without any establishment of liability to a
third party," as § 107(a) authorizes.  *Id.* at 139.  Thus, both functionally and as pled, this is
decidedly not an action for "cost recovery."

settling [responsible parties,]" CERCLA "provides a strong incentive to settle and initiate cleanup." *Id.* at 1119.

7.    While § 107(a) cost recovery actions and § 113(f) contribution actions provide two "clearly distinct" remedies, *supra* note 83, the provisions are not without overlap. *Atl. Research Corp.*, 551 U.S. at 138, 139 n.6.

8.    Specifically, § 107(a) defines the liability of the defendant in a contribution action. *AmeriPride Servs. Inc. v. Texas E. Overseas Inc.*, 782 F.3d 474, 489 (9th Cir. 2015). A plaintiff pursuing relief pursuant to § 113(f) "may seek contribution 'from any other person who is liable or potentially liable'" under § 107(a). *Id.* at 489–90. And, under § 107(a), a defendant in a contribution action is liable for those "necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B).

9.    Thus, reading § 113(f) together with § 107(a), "when a private plaintiff who incurred liability under § 9607(a)(B) for a third party's costs, the only response costs recoverable are those that were necessary and consistent with the NCP [national contingency plan]." *AmeriPride Servs. Inc.*, 782 F.3d at 490; *see also Karras v. Teledyne Ind., Inc.*, 191 F. Supp. 2d 1162, 1165 (S.D. Cal. March 25, 2002) ("[A] CERCLA section 113 claim for equitable contribution is grounded on the imposition of liability identified in section 107(a).").

10.     Here, the parties agree that "pursuant to the CERCLA contribution regime, [ASARCO] is entitled to recover an allocated proportion of the 'necessary costs of response incurred [at the Site] consistent with the national contingency plan.'" *ASARCO II*, 975 F.3d at 865 (citation omitted).  They disagree, however, on the amount ASARCO has "incurred" to clean up the Site; thus, they dispute the total amount eligible for allocation.

## II.    Costs "Incurred"

11.     "CERCLA, unfortunately, is not a model of legislative drafting."  *See, e.g., United States v. Bestfoods*, 524 U.S. 51, 56 (1998) (quoting *Exxon Corp. v. Hunt*, 475 U.S. 355, 363 (1986)).  Central to the issue to the parties' dispute here, for instance, is the statute's failure to define the word "incurred" within the meaning of § 107(a).

12.     When courts are left to interpret statutory voids, they must "construe Congress's intent," which requires beginning, "as always, with the language of the statute."  *Chubb Custom Ins. Co.*, 710 F.3d at 958 (citation omitted).

13.     To that end, and following the "fundamental precept of statutory construction" that undefined words "will be interpreted as taking their ordinary, contemporary, common meaning," *id.*, "[c]ourts interpreting the term 'incur' under CERCLA apply a plain meaning approach," *Kamb v. U.S. Coast Guard*, 869 F.

Supp. 793, 796 (N.D. Cal. Nov. 9, 1994).  In the same vein, and Congress'

penchant for legislative "circularity" notwithstanding, *Bestfoods*, 524 U.S. at 56,

courts construe CERCLA "in such fashion that every word has some operative

effect," *Chubb Custom Ins. Co.*, 710 F.3d at 959–60.

14.    Additionally, interpretation of a word "depends upon reading the

whole statutory text, considering the purpose and context of the statute, and

consulting any precedents or authorities that inform the analysis." *Id.* at 958

(quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 418, 486 (2006)).

15.    The Ninth Circuit has identified the ordinary meaning of "incur" as

"to acquire or come into, to become liable or subject to as a result of one's action,

to bring upon oneself." *Id.* at 961 (quoting *Am. Heritage Dictionary* (4th ed.

2000)) (modifications and internal quotation marks omitted).

16.    Further, courts have established guardrails, at least, as it relates to

what "incurred" does *not* mean—and it does not mean future costs for which no

liability has yet attached.

17.    For instance, the Ninth Circuit tethered policy to practice, explaining

that CERCLA encourages "actual cleanup by requiring plaintiffs to incur response

costs before they can recover them." *In re Dant & Russell, Inc.*, 951 F.2d at 250.

Because Congress tied "no strings on the award of response costs, allowing

recovery for future costs absent any binding commitment to incur these costs would leave no incentive to complete cleanup." *Id.* Thus, "bare assertions" that a plaintiff "will perform future cleanup" does not mean it has incurred costs within the meaning of CERCLA. *Id.* Costs must be "actually incurred" to be recoverable. *Id.*

18.     Additionally, and as discussed further *infra*, because CERCLA provides for a declaratory judgment action to establish liability for them, the Ninth Circuit stated explicitly that "CERCLA prohibits awards of future response costs." *Stanton Rd. Assocs. v. Lohrey Enters.*, 984 F.2d 1015, 1021 (9th Cir. 1993).

19.     Other circuits, too, backfilled parameters around the definitional void. The Second Circuit considers "incurred" temporally. That is, the court says, § 113(f) "permits a private party to be reimbursed for all or some of the costs *already* incurred in response to contamination." *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 91 (2d Cir. 2000) (emphasis added). The *Gussack Realty Co.* court emphasized that CERCLA's contribution provision authorizes suit for recovery of costs "at any time *after* such costs have been incurred." *Id.* (quoting 42 U.S.C. § 9607) (emphasis in original).

20.     For these reasons, when a district court awards "compensation for future costs that plaintiffs *will* incur remediating . . . the property[,]" it provides a

remedy not available under CERCLA.  *Id.* at 92 (emphasis added).  Instead, says the Second Circuit, "[t]he proper remedy for future costs is not a present lump-sum payment of anticipated expenses, but instead a declaratory award dividing future response costs among responsible parties."  *Id.* (citing 42 U.S.C. § 9613(g)(2)).

21.    The Eighth Circuit's approach to "incurred" comports with its sisters in the Second and Ninth Circuits: "the mere possibility, *even the certainty*, that an obligation to pay will arise in the future does not establish that a cost has been incurred."  *Trimble v. Asarco, Inc.*, 232 F.3d 946, 958 (8th Cir. 2000) (emphasis added).

22.    Refusing to expand the meaning of incurred to include potential future costs, the *Trimble* court determined that CERCLA plaintiffs had not "incurred" response costs when their attorneys—representing them on a contingency basis— paid for sampling near a contaminated site.  *Id.* at 951.  Distinguished from scenarios where a party is obligated to pay attorneys' fees regardless of whether those fees could be ultimately recovered from the adversary, or where a plaintiff is at all times liable to pay for cleanup services and goods already delivered, no such obligation would arise for the *Trimble* plaintiffs "unless and until" they obtained a final judgment against the defendant.  *Id.* at 957–58 (citing *Farmland Indus., Inc. v. Frazier-Parrott Commodities*, 111 F.3d 588 (8th Cir. 1997); *Quarles Petroleum*

*Co. v. United States*, 551 F.2d 1201 (Ct. Cl. 1977)).

23.    True, the *Trimble* court acknowledged, "a party may be found to have 'incurred' a cost without having actually paid for it." *Id.* at 958.  Such were the distinguishable scenarios outlined above, where costs are "incurred" based upon "*existing* legal obligation[s]." *Id.* (emphasis added).  But where a legal obligation has not yet arisen, costs are not "incurred"—even if an obligation to pay is certain to arise in the future. *Id.*

24.    Most recently, of course, the Ninth Circuit weighed in on the "incurred" issue in this very case, citing *Trimble* for the proposition that "[a]lthough the meaning of 'incur' is sufficiently broad that it does not require that an expense already be paid, it is also not so broad that it encompasses future expenses that are mere potentialities." *ASARCO II*, 975 F.3d at 865.

25.    Reading these cases together, a navigable framework emerges. Because doing so would undercut the motivation to complete cleanup and render meaningless the availability of declaratory relief, CERCLA prohibits a present, lump-sum award of future response costs, even if the plaintiff *will* incur those costs remediating the property. *See Stanton Rd. Assocs.*, 984 F.2d at 1021; *Gussack Realty Co.*, 224 F.3d at 92.  And, while a party need not have actually paid a cost to "incur" it, a legal obligation to pay must *presently* exist for CERCLA to

consider it "incurred."  "Even the certainty" that an obligation to pay will arise in the future is not enough.  *Trimble*, 232 F.3d at 958.

26.    Here, the parties agree that the $ 61,350,359 METG has spent through the custodial trust account constitutes necessary response costs "incurred" within the meaning of CERCLA.  With no dispute, then, that this amount is properly allocable pursuant to § 113(f), ASARCO is entitled to recover $15,337,590 from Atlantic Richfield, which represents 25% of the agreed amount of ASARCO's incurred costs.

27.    ASARCO goes on, however, to argue that it—by way of METG—has incurred an additional $24,878,000 to remediate the Site.  The Court disagrees.

28.    Like the unsuccessful plaintiffs in *Trimble*, ASARCO asks the Court to further expand the meaning of "incur" to encompass future costs that it admits are subject to contingencies and uncertainties.  But, by repeatedly tethering the words "earmarked" and "committed" to costs associated with the four components of the Final Remedy, ASARCO attempts to demonstrate the existence of *present* legal obligations to pay future costs.  The record belies ASARCO's approach.  The Court considers each element of the Final Remedy in turn.

### A.     Slag Pile

29.     First, ASARCO argues that it has "incurred" $7,660,000 in costs to remediate the slag pile.  Although it admits that those costs have not yet been spent, ASARCO contends they have been "incurred" because they are imminent and supported by concrete evidence.  Specifically, ASARCO points to Ms. Staub's testimony that, "by selecting the final remedy [for the slag pile], [the EPA] committed to costs to implement the remedy."[84]  Atlantic Richfield's expert, too, agreed that nothing is speculative about the need for the Final Remedy or whether it "will happen."[85]

30.     But while the record reveals nothing to undermine ASARCO's contention that the EPA has committed to *remedy* the slag pile in the manner outlined in METG's *Work Plan*, the Court agrees with Atlantic Richfield that the *costs* associated with implementing the remedy are not the "concrete, non-speculative costs 'incurred'" that ASARCO represents them to be.  (*See* Doc. 352 at 59.)

31.     Indeed, the *Work Plan* itself characterizes the $7,660,000 as a preliminary estimate of cost for remedying the slag pile, with Ms. Staub admitting that the amount is subject to fluctuation should metal prices continue to trend

---

[84] Hr'g Tr. vol. 1, 38:7–11.
[85] Hr'g Tr. vol. 2, 331:17–332:8.

favorably.[86]  Furthermore, Ms.Staub conceded that METG would continue to

"update" the costs associated with the slag pile remedy after it develops detailed

designs necessary for its implementation.[87]  She went on to agree that no invoices

or other contractual obligations are tethered to the costs estimated by METG in the

*Work Plan*, and that the costs associated with the slag pile could end up thirty

percent lower or fifty percent higher than METG's 2020 estimate.[88]  Ms. Roberts,

too, explained that cost estimates contained in METG's budgets account for the

fact that "things change rapidly and plans change" on Superfund sites like the one

at issue in this case.[89]

32.     ASARCO argues that "[f]acts and figures" contained in the *2018 CMS

Report*, the *Statement of Basis*, and the *Work Plan*, sufficiently prove "currently

existing obligations of future payment . . . even without proof of money spent."

(Doc. 352 at 58.)  However, the cases it cites for this proposition are readily

distinguishable or otherwise unhelpful.

33.     First, of course, black letter law establishes that "[w]hen a taxpayer

receives a loan, he incurs an obligation to repay that loan at some future date."

*C.I.R. v. Tufts*, 461 U.S. 300, 307 (1983).  Thus, based on the equal and offsetting

---

[86] Ex. 571 at 39; Hr'g Tr. vol. 1, 140:8–141:18.
[87] Hr'g Tr. vol. 1, 145:13–22.
[88] *Id.* at 138:4–139–1.
[89] *Id.* at 241:10–13; 238:9–239:9; 222:7–8.

obligation to repay, loan proceeds do not qualify as income to the taxpayer. *See id.* Apparently, ASARCO's argument as it relates to *Tufts* is that if a taxpayer "incurs" an obligation to repay a loan in the future, then a polluter similarly "incurs" future costs once the EPA approves a remedy. The problem with this comparison is that a taxpayer's obligation to repay a loan is tethered to the concrete principal amount she is loaned.

34.     In other words, for ASARCO's analogy on this point to work, the principal amount of the loan a taxpayer receives would be subject to substantial fluctuation after she executes the promissory note with her lender. Then, only after various eventualities came to pass over the course of years would the taxpayer learn the actual principal amount of the loan that she is obliged to repay. This is simply not the scenario the Tax Code envisions, nor is it a scenario tied to reality. While the taxpayer's loan repayment obligation may not come due until some future date, that does not mean that the principal amount she must ultimately repay "could end up thirty percent lower or fifty percent higher"[90] than the amount she borrowed when she signed the loan document.

35.     Here, in contrast, the $7,660,000 estimated to complete the Final Remedy as it relates to the slag pile is undisputedly an estimate that is subject to

---

[90] *C.f. id.* at 138:4–139–1.

substantial fluctuation over the course of about a decade.  The Court is

unpersuaded that anything about the *Work Plan*'s estimate of future costs to

remediate the slag pile compares to the obligation a taxpayer incurs to repay the

concrete principal amount of a loan.

36.     ASARCO also cites an unpublished case out of the Third Circuit for

the proposition that the estimates of future costs contained in the *Work Plan* have

somehow been incurred within the meaning of CERCLA.  (Doc. 352 at 58 (citing

*U.S. Virgin Islands Dep't of Planning v. St. Croix Renaissance Grp.*, 527 Fed.

Appx. 212, 214–15 (3d Cir. 2013) ("*Virgin Islands*").)  However, this case also

fails to move the needle in ASARCO's favor.

37.     There, the trial court determined that, by its reading of the fee

agreement at issue, costs advanced by the CERCLA plaintiff's attorneys for

sampling, laboratory analyses, and site visits were not "incurred" by the plaintiff as

a matter of law.  *Virgin Islands*, 527 Fed. Appx. at 214.  But the appellate court

reversed, explaining that the way in which the fee agreement was drafted could

lead a reasonable jury to conclude that the plaintiff was obligated to reimburse the

already-advanced costs of $61,519.67, regardless of whether a condition—

legislative appropriation of funds—came to pass.  *Id.* at 215.

38.     Notably, the Third Circuit took care to distinguish the case before it

from *Trimble*.  *Id.* at 215 n.2.  As already discussed *supra*, *Trimble* involved "no question that the obligation to pay costs was contingent upon the success of the lawsuit."  *Id.*  Meanwhile, in *Virgin Islands*, a genuine factual dispute remained as to whether the plaintiff was obliged to pay costs, irrespective of whether some event occurred.

39.    Thus, except to the extent that it is consistent with *Trimble*, *Virgin Islands* is inapposite to the question of whether METG's preliminary estimates related to the slag pile remedy establish "incurred" costs within the meaning of CERCLA.

40.    In sum, no dispute exists regarding the need for the Final Remedy—including the remedy chosen for the slag pile—and the fact that the remedial work "will happen."[91]  But "even the certainty[] that an obligation to pay [costs] in the future does not establish that a cost has been incurred" under CERCLA's paradigm.  *Trimble*, 232 F.3d at 958.  So while ASARCO has certainly established that METG, by way of EPA approval, has committed to a remedy as it relates to the slag pile for which costs *will* be incurred in the future, METG's preliminary cost estimates plainly constitute future response costs.  Specifically, nothing in the record indicates that there is an *existing* legal obligation to pay the $7,660,000

---

[91] *See* Hr'g Tr. vol. 2, 331:17–332:8.

estimated in the *Work Plan*.  *See id.*

41.     As outlined above, CERCLA prohibits awards of future response

costs.  *See Stanton Rd. Assocs.*, 984 F.2d at 1021; *Gussack Realty Co.*, 224 F.3d at

91.  And because the Court concludes that the $7,660,000 associated with

completing the Final Remedy for the slag pile constitutes future response costs, it

denies ASARCO's request for a present, lump-sum award for Atlantic Richfield's

proportionate share.

### B.     Corrective Measures Operations and Maintenance

42.     ASARCO similarly contends that because EPA has approved and

METG has "committed" to implementing O&M through 2046, the cost estimate

for O&M contained in METG's *Work Plan*—$7,930,000—constitutes a presently

"incurred" recoverable cost.  For many of the same reasons the Court finds the

estimated costs associated with the slag pile remedy to be future, presently

unrecoverable costs, it concludes that the $7,930,000 estimated to conduct O&M

for the next two-and-a-half decades are not costs "incurred" within the meaning of

CERCLA.

43.     Again, no dispute exists that O&M, like the other three elements of

the Final Remedy, constitutes a remedial action that *will* take place at the Site and

that it is necessary.[92]

44.      Be that as it may, Ms. Staub admitted and the *Work Plan* reveals that costs associated with O&M through 2046 are preliminary estimates of future costs, subject to unforeseen conditions—like floods—that could cause the costs *actually* incurred for O&M to diverge from those estimates.[93]   Indeed, Ms. Staub conceded that the amounts actually incurred for O&M have varied wildly from the costs METG estimated.   Most strikingly, in 2019, METG spent $600,000 less than had been budgeted and approved for the year's O&M costs.[94]

45.      Notwithstanding ASARCO's heavy reliance on terms like "earmarked," the Court cannot agree that METG's projections for O&M costs, from which actual expenditures have substantially deviated already, constitute costs "incurred" within the meaning of CERCLA.   ASARCO presented no invoices or other evidence to suggest that liability to pay any of the estimated $7,930,000 has yet attached.

46.      At bottom, ASARCO has established that O&M will take place at the Site as an element of the Final Remedy, and that an obligation to pay the costs of O&M will certainly arise.   However, again, "the mere possibility, even the

---

[92] *Id.* at 316:2–23; 313:12–18.
[93] *See, e.g.* Ex. 571 at 21; Hr'g Tr. vol. 1, 150:5–16.
[94] Hr'g Tr. vol. 1, 158:5–18; Ex. 1025 at 9.

certainty, that an obligation to pay will arise in the future does not establish that a cost has been incurred, but rather establish that a cost *may* be incurred, or *will* be incurred." *ASARCO II*, 975 F.3d at 866 (quoting *Trimble*, 232 F.3d at 958) (emphasis added).

47.     Accordingly, without any evidence of an *existing* legal obligation to pay the future costs estimated for O&M as they are outlined in the *Work Plan*, the Court cannot award ASARCO the present lump sum for Atlantic Richfield's share of O&M costs that it seeks.

### C.     Corrective Measures Performance Monitoring

48.     For the same reasons, the Court cannot agree with ASARCO's contention that the cost estimated for Corrective Measures Performance Monitoring through 2046—$7,280,000—constitutes anything more than presently unrecoverable future costs.

49.     Mr. Booth agreed that Corrective Measures Performance Monitoring is necessary and important to ensure that the Final Remedy is meeting relevant criteria, and that Site conditions remain protective of human health and the environment.[95]   But, he viewed METG's estimate contained in the *Work Plan* as overshooting the cost of Corrective Measures Performance Monitoring by about

---

[95] Hr'g Tr. vol. 1, 265:2–11.

four million dollars.[96]

50.     ASARCO again provides no invoices or evidence of other existing legal obligation to pay the costs contained in the *Work Plan*'s preliminary estimate of costs for Corrective Measures Performance Monitoring.  With this evidentiary void in mind, coupled with Mr. Booth's significantly disparate estimate, the Court cannot conclude that ASARCO carried its burden to prove the $7,280,000 budgeted for this purpose constitutes an "incurred" response cost.

51.     Certainly, the Court is convinced that, like the slag pile and O&M, future costs for Corrective Measures Performance Monitoring *will* arise.  But this is insufficient to establish that the cost ASARCO seeks to allocate and recover from Atlantic Richfield "has been incurred" at this point.  *See ASARCO II*, 975 F.3d at 866.

52.     The Court denies ASARCO a present lump sum award for Atlantic Richfield's proportionate share of Corrective Measures Performance Monitoring, because the amount it seeks constitutes an estimated future cost that has yet to be incurred.

**D.     Prickly Pear Creek Bypass Channel**

53.     Finally, and for the same reasons it finds future costs for the other

---

[96] Hr'g Tr. vol. 2, 314:3–13.

three ongoing elements of the Final Remedy presently unrecoverable, the Court rejects ASARCO's argument that it has "incurred" costs to remove the Prickly Pear Creek bypass.

54.     The central problem with ASARCO's characterization of the cost associated with the Prickly Pear Creek bypass removal as an actual cost "incurred" is the fact that the $2,008,000 budgeted for this element of the Final Remedy is undisputedly a preliminary estimate of cost.[97]  Again, ASARCO presents no evidence of an *existing* legal obligation to pay this amount, and even the timeframe for starting and completing this project is subject to change.[98]  Indeed, work has not even yet started on this project.[99]

55.     As it does with the estimated costs associated with the other three elements, ASARCO asks the Court to ignore the common meaning of the word "incurred": acquired or came into, became liable for or subject to as a result of one's action, brought upon oneself.  *See Chubb Custom Ins. Co.*, 710 F.3d at 961. Instead, ASARCO invites the Court to award it a share of estimates of *future* costs, without any evidence of an existing legal obligation to pay them.  On this case's second trip back from the Ninth Circuit, the Court declines to do what CERCLA so

---

[97] Ex. 571 at 37.
[98] *Id.*
[99] *Id.*

clearly prohibits.  *See Stanton Rd. Assocs.*, 984 F.2d at 1021.

56.     Accordingly, the Court denies the present lump sum award ASARCO seeks as it relates to the estimated cost to remove the Prickly Pear Creek bypass.

57.     Finally, ASARCO provides no authority, and the Court finds none, to support its suggestion that either CERCLA itself or the Decree constitute an "existing legal obligation" such that the Court may properly award a present lump sum for future remediation costs.  Instead, the Court agrees with Atlantic Richfield that if either source supplied such an obligation, the Ninth Circuit would have left the Court's prior judgment in place, and ASARCO's $111,403,743 payment pursuant to the Decree would be fully allocable.  But that is not the case.

58.     In sum, then, the Court concludes that ASARCO failed to establish that legal obligations exist to pay for the cost estimates associated with the four ongoing elements of the Final Remedy.  And, because CERCLA prohibits awards of future response costs, the Court cannot presently award ASARCO the allocation of $24,878,000 that it seeks.  At this juncture, that amount is an admittedly mutable estimate of the costs necessary to complete the Final Remedy.

59.     Instead, and pursuant to the parties' stipulation, the Court will award ASARCO 25% of the total costs incurred to remediate the Site.  Thus, with $61,350,359 in necessary response costs incurred to date, ASARCO may presently

recover $15,337,589.80 in contribution from Atlantic Richfield.  As it relates to ASARCO's request for future costs, the Court turns to CERCLA's declaratory remedy.

### III.   Declaratory Relief

60.     In addition to a present lump sum contribution for response costs incurred at the Site, ASARCO also seeks declaratory relief pursuant to CERCLA § 113(g)(2) for 25% of all future costs actually incurred.  (Doc. 325 at 11.) Atlantic Richfield contends that the declaratory judgment ASARCO seeks—fixing its total liability for future costs at 25%—would be premature, particularly as it relates to the Final Remedy chosen for the slag pile and Corrective Measures Performance Monitoring.  Specifically, Atlantic Richfield contends that ASARCO failed to present evidence either at the 2018 trial or the 2021 hearing on remand that the Final Remedy for the slag pile and monitoring costs is related to the arsenic groundwater plume on which the Court's 25% allocation is based.

61.     The Court disagrees with ASARCO's assessment that the law of the case or the rule of mandate operate to foreclose Atlantic Richfield's argument.  *Cf. Georgia-Pacific Consumer Prods. LP v. NCR Corp.*, 358 F. Supp. 3d 613, 635–36 (W.D. Mich. 2018) (explaining that an allocation for "past costs only" may inform allocation of future costs, but the record must provide a sufficient basis for

equitably apportioning those costs yet to be incurred).  Nevertheless, considering CERCLA's purpose and the evidence presented thus far in this case, the Court rejects Atlantic Richfield's insistence that the evidence fails to support bringing the 75%/25% allocation forward to apply to future costs of completing the Final Remedy.

62.    The Ninth Circuit reads CERCLA to authorize declaratory judgments in contribution actions, the statute's silence on the issue notwithstanding.  *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1191 (9th Cir. 2000) ("*Boeing II*").  Thus, a court may properly award declaratory relief to a contribution plaintiff, allocating the share of responsibility for remaining cleanup expenses between parties.  *Id.*

63.    Indeed, the appellate court emphasized the propriety of declaratory relief in this case, explaining that a contribution-seeker like ASARCO could pursue both contribution for necessary response costs incurred to date, as already discussed *supra*, as well as "a declaratory judgment to establish liability and contribution allocation for those costs that have not been incurred yet, but may be incurred in the future."  *ASARCO II*, 975 F.2d at 868.

64.    CERCLA's declaratory remedy encourages quick response and places costs on responsible parties, "because all parties . . . will know their share of costs before they are incurred," *Boeing II*, 207 F.3d at 1191.  Specifically,

[t]he more liability can be limited and quantified, the more practical it
is for a party to budget and borrow and finance it.  Environmental
litigation is tremendously complex, lengthy, and expensive.  The costs
and time involved in relitigating issues as complex as these where new
costs are incurred would be massive and wasteful.  Declaratory relief
allocating future costs is therefore consistent with the broader purposes
of CERCLA.

*Id.*

65.     In short, declaratory relief avoids adding to the "already

elephantine carcass of CERCLA litigation."  *Kelley v. E.I. DuPont de*

*Nemours and Co.*, 17 F.3d 836, 845 (6th Cir. 1994) (ellipses in original

omitted).

66.     To that end, a CERCLA § 113 plaintiff is entitled to a declaratory

judgment allocating responsibility for future costs if "it establishes that hazardous

substances were disposed of at the site, that plaintiff has incurred clean-up costs,

and there is a basis for establishing future liability."  *Boeing Co. v. Cascade Corp.*,

920 F. Supp. 1121, 1140 (D. Or. 1996) ("*Boeing I*"), *remanded on other grounds*

*by Boeing II*, 207 F.3d at 1192.

67.     Atlantic Richfield's argument against declaratory relief focuses on the

last element—whether a basis for establishing future liability exists.  As noted

already, Atlantic Richfield argues against carrying forward the 75:25 ratio

established and affirmed for costs already incurred to the allocation for future

costs, because ASARCO "failed to present evidence establishing that all the [f]uture [c]osts are related to the arsenic groundwater plume on which this Court based its allocation of liability for the Site." (Doc. 353 at 41.) Specifically, Atlantic Richfield says, no evidence establishes that the slag pile remedy and Corrective Measures Performance Monitoring relate to the arsenic groundwater plume.

68. But ASARCO has presented evidence—both at the 2018 trial and at the hearing on remand—to establish a basis for allocation of future costs which is the same as that for past costs.

69. Looking back at the 2018 trial, Atlantic Richfield's expert explained that there are no separate remedies to address arsenic releases versus selenium releases, as Atlantic Richfield now suggests. Specifically, Brian Hansen testified that "by addressing the sources of arsenic . . . the sources of selenium are similarly addressed. So, you know, what we do for arsenic, we're also doing for selenium at this site."[100]

70. This conclusion has not changed, and remains as valid today as it was at trial. According to EPA publications, the remedy for the slag pile, for example, addresses *both* arsenic and selenium.[101] And as was proven at the 2018 trial, both

---

[100] Trial Tr. vol. 6, 1492:24–1493:2 (June 5, 2018).
[101] Ex. 573 at 2.

Atlantic Richfield and ASARCO are responsible for releases of arsenic into the groundwater at the Site. (Doc. 269 at 35–53.) Indeed, this Court determined that "the operations of Anaconda's zinc fuming plant contributed arsenic to the groundwater to an extent that a percentage of allocation should be assigned to Atlantic Richfield[.]" (*Id.* at 53.)

71.    Furthermore, testimony at trial established that Anaconda contributed not only to arsenic contamination at the Site, but also to selenium releases. Specifically, ASARCO's trial expert, Andy Davis, testified that when Anaconda fumed slag, it created a waste stream that included selenium. This stream ended up on the slag pile. Moreover, Mr. Davis testified that between 1927 and 1962, Anaconda generated a slurry that was deposited at the base of the slag pile, which was eventually burned by hot slag being dumped on it, generating fly ash that reacted with water and produced concentrations of selenium at approximately half a milligram per liter.[102] At the hearing on remand, Mr. Booth offered no contrary opinion as to Anaconda's selenium releases.[103]

72.    Since the 2018 trial, the EPA has identified arsenic as a driver of the slag pile remedy, stating that "re-grading and capping the ASARCO slag pile [will]

---

[102] Trial Tr. vol. 5, 10:49:14–1050:3 (June 4, 2018.
[103] Hr'g Tr. vol. 2 at 325:9–14, 334:17–22.

minimize the last major source of arsenic contamination to the groundwater[.]"[104]
In other words, it is not only the removal of the unfumed slag from the top of the
pile that remedies the arsenic contamination, *but also* regrading and capping the
remainder of the pile, to which Anaconda undisputedly contributed.

73.     That Atlantic Richfield (or its predecessor) did not contribute
unfumed slag to the pile is irrelevant to the question of whether it is liable for some
of the cost of re-grading and capping the remainder—which includes fumed slag—
to minimize the last major source of arsenic contamination at the Site.

74.     Additionally, the Court is unpersuaded by Atlantic Richfield's efforts
to parse the future costs of Corrective Measures Performance Monitoring based on
its estimation that 20 percent of those costs are driven by the larger size of the
selenium plume.  (*See* Doc. 353 at 42.)

75.     As the Court already found, the contaminants tested at each
monitoring well do not vary, and testing is not limited to a single contaminant—
each tests for arsenic, for which Atlantic Richfield is undisputedly responsible, as
well as selenium and a variety of other pollutants.[105]

76.     More importantly, Corrective Measures Performance Monitoring
began in 2016, and the scope of testing and monitoring does not change from year

---

[104] Ex. 573 at 1.
[105] Hr'g Tr. vol. 1, 75:24–76:5.

to year.[106]  The Court is unpersuaded that its allocation for past costs should not carry forward to future costs for a component of the Final Remedy that undisputedly remained stable.

77.    In sum, the Court finds Atlantic Richfield's arguments unpersuasive that somehow the presence of selenium on the Site calls into question its liability as it relates to the Final Remedy for the slag pile and Corrective Measures Performance Monitoring.  Arsenic remains a primary driver behind both components of the Final Remedy.

78.    Application of the 75%/25% allocation for future costs is buttressed, too, by the reasons determined and affirmed for allocating past costs pursuant to the same ratio.

79.    For example, and of particular relevance to Atlantic Richfield's argument that it should not be held responsible for the costs of particular components of the Final Remedy, the Ninth Circuit left in place the Court's findings and conclusions related to "how much hazardous waste was involved, as well as the degree of toxicity of that waste," and "the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste." *ASARCO II* at 870.  Specifically, while everyone agreed that

---

[106] Ex. 576 at 16; Ex. 571 at 39; Hr'g Tr. vol. 1, 75:9–76:3.

ASARCO caused the majority of the groundwater contamination at the Site, "both parties used vast quantities of arsenic-laden materials in their everyday operations and generated substantial amounts of arsenic-laden by products." *Id.* Moreover, although this Court acknowledged that it could not quantify all of Atlantic Richfield's past releases, "it noted that Atlantic Richfield released so much toxic fly ash and coal dust that it received complaints from the City of Helena." *Id.* Again, arsenic remains a primary driver behind the disputed components of the Final Remedy—the slag pile and Corrective Measures Performance Monitoring. The presence of selenium leaves unchanged the fact that both parties used and produced arsenic-laden materials, for which Atlantic Richfield must bear some responsibility for cleaning up—cleanup which is not yet complete.

80.    This Court also correctly considered the other Gore factors, to include, *inter alia*, "the degree of cooperation by the parties with federal, state, or local officials to prevent any harm to public health or the environment." *Id.* On this point, the Court determined that Atlantic Richfield "had repeatedly evaded responsibility for any environmental contamination at the Site, flagrantly misled the EPA regarding its releases at the Site, and made ongoing misrepresentations throughout the course of the litigation." *Id.* In other words, and as the Ninth Circuit put it, Atlantic Richfield's conduct was "egregious." *Id.* This factor, like

the others, remains unchanged by the presence of selenium on the Site.

81.    In total, the arsenic pollution on the Site "has been carefully studied, the parties litigated a genuine controversy about millions of dollars they had already spent, and the facts bringing about their relative responsibility have already occurred." *Cf. Boeing II*, 207 F.3d at 1192.  That Atlantic Richfield now seeks to quibble about whether ASARCO produced more selenium than Atlantic Richfield is irrelevant to the question whether Atlantic Richfield should bear its fair share of arsenic cleanup—which is focused on the ongoing and future remediation of the slag pile and the Corrective Measures Performance Monitoring.

82.    For the foregoing reasons, and for the reasons discussed and affirmed in allocating past costs, the Court concludes that an allocation of 75%/25% for future costs associated with the Final Remedy at the Site is appropriate.  "[T]he allocation scheme established here is supported by the evidence presented at trial [and at the post remand hearing], and accurately reflects both the current situation and the situation as it is likely to exist and change during remediation." *Boeing I*, 920 F. Supp. at 1141.

83.    The Court cautions ASARCO, however, that it must remain prepared to prove that future costs are necessary and consistent with the NCP.  The Court will consider future developments showing that the allocation scheme is no longer

equitable; but "known variables of uncertain quantification will not be re-examined." *Id.* That is, the Court does "not wish to encourage either party to return to court lightly." *Id.*

84.     By entering declaratory judgment holding Atlantic Richfield liable for 25% of future costs when they are incurred, the Court seeks to promote the timely cleanup of arsenic on the Site on the one hand, and to avoid adding to the "already elephantine carcass of CERCLA litigation" on the other. *See Kelley*, 17 F.3d at 845. Certainly it was not the intent of the Ninth Circuit on remand that, for the next ten to thirty years, the Court and the parties should be required to revisit, anew, the question of allocation every time costs are incurred and recoverable at the Site.

## IV.    Uncertainty Premium

85.     Pursuant to the Court's 2018 Judgment, Atlantic Richfield remains liable for the $1 million award under the sixth Gore factor.  (Doc. 269 at 88.)

86.     The Court based this award on Atlantic Richfield's failure to cooperate with federal, state, and local officials to prevent any harm to public health or the environment.  As the Ninth Circuit discussed and as has been iterated here, the Court found that "Atlantic Richfield had repeatedly

evaded responsibility for any environmental contamination at the Site,

flagrantly misled the EPA regarding its releases at the Site, and made

ongoing misrepresentations throughout the course of the litigation."

*ASARCO II*, 975 F.3d at 870.

## V.     Prejudgment Interest, Costs, and Bond

87.     CERCLA § 107(a)(4) provides for the recovery of prejudgment

interest, which "shall accrue from the later of the (i) the date payment of a

specified amount is demanded in writing, or (ii) the date of the expenditure

concerned."  42 U.S.C. § 9607(a)(4).

88.     The Court has already determined that Atlantic Richfield is

liable for prejudgment interest running from June 5, 2012, and that the

Superfund rate set forth in 42 U.S.C. § 9507(d)(3)(C) applies.  (Docs. 269 at

94; 284 at 5–6.)

89.     Accordingly, ASARCO is entitled to recover prejudgment

interest on the amount of Atlantic Richfield's calculated equitable share of

$16,337,589.80 ($15,337,589.80 + $1 million) at the Superfund rate

beginning on June 5, 2012.

90.    For the years 2012 through 2021, the Superfund Interest Rates[107] are

as follows:

| Fiscal Year[108] | Superfund Interest Rates |
| --- | --- |
| 2012 | 0.74% |
| 2013 | 0.78% |
| 2014 | 0.81% |
| 2015 | 0.75% |
| 2016 | 0.67% |
| 2017 | 0.70% |
| 2018 | 0.87% |
| 2019 | 1.75% |
| 2020 | 2.22% |
| 2021 | 0.10% |

91.    Using the above Superfund Interest Rates, Atlantic Richfield

owes ASARCO prejudgment interest beginning on June 5, 2012 and ending

on the date of entry of this Judgment.

92.    Pursuant to this Court's October 5, 2018 Order, Atlantic

Richfield also owes ASARCO $37,194.27 in costs.  (Doc. 284 at 14.)

93.    ASARCO is allowed post judgment interest at the rate

established in 26 U.S.C. § 1961.

---

[107] The United States Treasury's Bureau of fiscal Services calculates the Superfund Interest Rates each fiscal year and publishes the yearly rates on its website. *https://www.epa.gov/superfund/superfund-interest-rates* (last visited May 21, 2021).
[108] Because prejudgment interest begins on June 5, 2012, only 290 days of interest should be calculated for 2012.  The calculation should also include interest for 145 days in 2021 (through May 26, 2021).

94.     This Court has the prior original bond submitted by Atlantic Richfield.  (Docs. 290, 291.)  The stay of execution of this Judgment shall remain in place while any appeal from this Judgment is pending.

95.     Further, Atlantic Richfield may substitute an original bond in the lower amount indicated in this Judgment, inclusive of prejudgment interest, costs, and twenty-four months of post-judgment interest.  Such a bond amount need not include costs future costs associated with the Declaratory Judgment.

96.     Pursuant to this Court's prior order (Doc. 290), the Clerk of Court may return the original bond only upon Atlantic Richfield depositing a substitute original bond and all supporting documentation with the Clerk of court for safekeeping.  The Clerk shall not return the substituted bond absent an Order by this Court.

## JUDGMENT

Accordingly, IT IS ORDERED that Judgment shall be entered by the Clerk of Court in favor of Plaintiff ASARCO and against Defendant Atlantic Richfield as follows:

(1)     Atlantic Richfield shall pay to ASARCO $15,337,590 for necessary costs of response incurred pursuant to CERCLA § 113(f), which

constitutes 25% of $61,350,359.

(2)     Atlantic Richfield shall pay to ASARCO $1,000,000 based on this Court's previous findings regarding Atlantic Richfield's lack of cooperation.

(3)     Using the Superfund Interest Rates outlined above, Atlantic Richfield shall pay to ASARCO prejudgment interest running from June 5, 2012 until the date of entry of this Judgment.

(4)     Atlantic Richfield shall pay to ASARCO $37,194.27 in costs.

(5)     Atlantic Richfield shall pay to ASARCO post-judgment interest pursuant to 26 U.S.C. § 1961.

IT IS FURTHER ORDERED that the Clerk of Court shall enter Declaratory Judgment in favor of Plaintiff ASARCO and against Defendant Atlantic Richfield as follows:

(1)     The Site is a "facility" within the meaning of 42 U.S.C. § 9601(9); a "release" of a "hazardous substance" from the Site occurred within the meaning of 42 U.S.C. § 9607(a)(4); such "release" caused ASARCO to incur response costs "necessary" and "consistent" with the National Contingency Plan pursuant to 42 U.S.C. §§ 9607(a)(4)(A) and (B); and Atlantic Richfield is a responsible "person" subject to the liability

provisions of 42 U.S.C. § 9607(a).

(2)     Atlantic Richfield is liable to ASARCO for 25% of all future costs incurred at the Site that are necessary and consistent with the National Contingency Plan, subject to the contingency that future events and discoveries based on new information, unknown to the parties at the time of trial or not reasonably within their contemplation, may impact or disprove the 25% allocation.  In such an event, and upon a showing of a good faith effort to meet and confer beforehand, the parties may return to the Court for resolution.

Finally, IT IS ORDERED that the stay of execution or enforcement of this Judgment shall remain in place while any appeal is pending.  Atlantic Richfield shall be allowed to substitute a bond at the amount set forth herein.

DATED this 26th day of May, 2021.


_____
Dana L. Christensen, District Judge
United States District Court